## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re | ) | Chapter 11 |
| | ) | |
| VENOCO, LLC, *et al.*, | ) | Case No. 17-10828 (KG) |
| | ) | |
| Debtors. | ) | |
| CITY OF BEVERLY HILLS, | ) | |
| and | ) | |
| BEVERLY HILLS UNIFIED | ) | |
| SCHOOL DISTRICT, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Adv. Pro. No. 17-50483 (KG) |
| | ) | |
| VENOCO, LLC, | ) | |
| | ) | |
| Defendant. | ) | **Re:  D.I.'s 3 & 9** |

## OPINION ON MOTION FOR
## PRELIMINARY INJUNCTION

The City of Beverly Hills, California and the Beverly Hills Unified School District

(the "School District") (collectively, the "Plaintiffs")[1] have moved for a preliminary

injunction (the "Motion") against Venoco, LLC ("Venoco") Debtor-in-possession and

Defendant.  The precise relief the Plaintiffs seek is an Order:

(1)      Directing Venoco to remain on, monitor, and maintain the site (discussed

within) until the earliest of the following: (a) Venoco has satisfactorily complied with the

Plug and Abandon Order issued by DOGGR and the Compliance Order issued by the

---

[1]    The California Department of Conservation, Division of Oil, Gas and Geothermal Resources ("DOGGR"), filed a Limited Joinder. D.I. 9.

City of Beverly Hills; (b) to the extent that Venoco has any disputes with regard to the Plug and Abandon Order and/or the Compliance Order, those disputes have been resolved and Venoco has complied with the respective orders consistent with any such resolution; or (c) further order of this Court, upon a finding that Venoco's continued presence at the Site is no longer necessary or appropriate; and

(2)    Directing Venoco to create a reserve of an appropriate amount of funds to enable it to comply with the Plug and Abandon Order and the Compliance Order.

The Complaint for Injunctive and Equitable Relief (D.I. 1) demands that "this Court enter an order to maintain the status quo by directing the Debtor to reserve an appropriate amount of funds . . . to comply with the Plug and Abandon Order and the Compliance Order . . . . ." Complaint, "Wherefore" clause.

The circumstances which the Motion presents is troubling. Venoco, a debtor before the Court, is looking to forego contractual obligations. It will take time and money for Venoco to meet its obligations and Venoco does not have enough of either. The Court takes no solace in the fact that what is taking place is in another community, far across the country. We are one country. Venoco's financial situation places it before the Court but without relief there will be financial harm to the City of Beverly Hills, the School District and perhaps the State of California. The essence of the Motion, however, is in reality the harm the Motion seeks to alleviate is financial harm. The Court is a bankruptcy court and financial harm is something the Court deals with every day. Where a problem, even a serious one as here, can be addressed through the claims process, the Court will

not enjoin a debtor's actions.  Therefore, for the reasons which follow the Court will deny the Motion.

## JURISDICTION

The Court has jurisdiction pursuant to 28 U.S.C. §§ 1334 and 157.  Venue is proper pursuant to 28 U.S.C. § 1409, and this is a core matter pursuant to 28 U.S.C. § 157(b)(2)(A), (I), (J) and (O).

## FACTS[2]

### The Drill Site

Venoco is or was the operator of an oil and gas-producing well site and facility located on a 0.73 acre segment of a 7.8 acre property within the City of Beverly Hills, California, which is owned by the Beverly Hills Unified School District (the "Site"). The property also serves as the site of the Beverly Hills High School, the School District's only high school.[3]  Venoco acquired the rights to the oil and gas facility, including the mineral rights to the oil and gas, in 1995 by transfer from a predecessor entity.  The transfer included a transfer and assumption of an Oil and Gas Lease (the "Lease"), originally dated 1959 and as amended thereafter in 1960, 1961, 1976, 1977 1978, 1983 and 1996, between and among the School District, the City of Beverly Hills, and the oil production company lessee (the "Lessee").

---

[2]    In the interest of time, many of the facts, particularly undisputed facts, are taken from the Plaintiffs' Motion for Preliminary Injunctive Relief to Maintain Status Quo.  The Court will identify disputed facts.

[3]    The Plaintiffs introduced blown-up photographs of the Site at the hearing.  PX 5 and 6.

The Site is situated on a portion of the Beverly Hills High School property, where young adults of high school age living in Beverly Hills attend school. The Site is directly adjacent on two sides to the Beverly Hills High School recreational facilities, which are used not only by the school for athletic activities, but also by the public at large. The recreational facilities include a track field, football field and baseball diamond. The site is approximately 80 feet from the nearest residence, and less than 250 feet from a hospital.

The Site contains a derrick, buildings, oil tanks, and other equipment. Below the Site's concrete surface are 19 oil and gas wells. PX 5 & 6.

The Site was constructed between 1979 and the mid-1980s.  It is in a "sensitive area," as that term is defined by California statute, to mean an area containing a building intended for human occupancy, such as a residence, school, hospital or business that is located within 300 feet of an active gas pipeline. Cal. Public Resource Code ("PRC") § 3270.5(b)(2). The regulations provide a similar definition of the term "environmentally sensitive." Cal. Code Regs., tit. 14, § 1760(e).

The Site is also within an "urban area," as that term is defined in the regulations, as "a cohesive area of at least twenty-five business establishments, residences, or combination thereof, the perimeter of which is 300 feet beyond the outer limits of the outermost structure." Cal. Code Regs., tit. 14, § 1760(p).  The wells at the Site are "critical wells" within the meaning of that term in the applicable regulations, as the wells are within 300 feet of the buildings identified by example in PRC § 3270(b)(2), and/or within 100 feet of any public street or highway in general use, or any public recreational facility.

4

Cal. Code Regs., tit. 14, § 1720(a). The pipeline at the Site is an "urban pipeline," as defined. Cal. Code Regs., tit. 14, § 1760(q).

Construction of the Site

In or about 1977, a proposal was made to construct the urban oil and gas drill site in a new location on the Beverly Hills High School property where the Venoco facility came to be built. In conjunction with that proposal, and the prospective construction of a new oil and gas production facility on the property, the Lease that Venoco later acquired and assumed was amended, in July 1977 and again in November 1978, in several respects. As a result, the Lease provides that the Lessee's right to extract oil and gas from the site was to terminate automatically on December 31, 2016.

The Lease as amended also provides that, within the ensuing 90 days after the date of termination, the Lessee was to "completely abandon all oil and gas operations on the New Drillsite in accordance with all applicable laws, regulations and agreements" and "restore the New Drillsite to its original condition."

An Environmental Impact Report was prepared and completed in May 1978 (the "1978 EIR"), in compliance with the California Environmental Quality Act ("CEQA"). The 1978 EIR, with its Appendix and Addendum, is a substantial, detailed document, roughly 480 pages in length. The 1978 EIR expressly noted that, under the proposal being assessed, "abandonment" of the drill site would occur at the end of 2016, "at which time the site would be fully restored to its original condition." 1978 EIR, p. 4.

The project for which the Lessee obtained the required approval from DOGGR was a project in which the oil and gas production at the site was expressly set to cease by

December 31, 2016, with the wells then to be properly "abandoned" in accordance with applicable laws and regulations.

The City of Beverly Hills granted permits as required for the construction of the Site on the property, premised on the 1978 EIR and the terms in the Lease amendments that all oil and gas production would terminate on or by December 31, 2016, and the property would then be restored to its original condition.  The City of Beverly Hills also amended its Municipal Code, to generally prohibit any more surface oil and gas drilling, production and extraction activities within the City, with an exception allowed for the Site. Municipal Code, § 10-5-302(A), within Title 10 (Planning and Zoning), Chapter 5 (Mining and Extraction), Article 3 (Oil Wells). The Site could continue to operate, but "all drilling, production, and extraction activities occurring from surface locations in the city, including [the Venoco Site]…, shall cease by December 31, 2016." Municipal Code § 10-5-323(A).   The ordinance further required that within 90 days after December 31, 2016, any operator of oil and gas wells, such as the Lessee under the Lease, was required to restore the drill site to its original condition. See Municipal Code, § 10-5-318(A) 40 & 41.

Venoco became the Lessee and the "operator" of the facility in 1995. The term "operator" is defined to include any person who, "under the authority of a lease or any other agreement, has the right to drill, operate, maintain, or control a well or production facility." PRC § 3009.

<u>Venoco's Assumption of the Lease</u>

In 2016, Venoco, Inc., the immediate predecessor in interest of Venoco, filed for Chapter 11 bankruptcy relief.  Venoco, Inc. and affiliates filed a Disclosure Statement in

6

support of their First Amended Joint Chapter 11 Plan of Reorganization (at page 16, D.I.

221, filed 5/17/2016), and represented the following:

> The Debtors also operate in the Beverly Hills West field, located in Beverly Hills, California. The lease for this field expires on December 31, 2016 (the "Lease"). The Debtors have continued to meet their obligations under the Lease during these cases. This includes not only the full payment of all royalties, but also the stringent operating procedures with an emphasis on environmental health and safety. The Debtors will assume the Lease pursuant to the assumption provisions set forth in the Plan. The Debtors intend to fund their remaining obligations under the Lease from cash on hand and operating revenues. The Debtors also have insurance coverage and surety bonds for any environmental hazards arising at the Lease premises. Without limitation, as it relates to the Beverly Hills site, the Reorganized Debtors intend to comply with all applicable federal, state and local laws and regulations regarding any abandonment and restoration obligations.

> Regulations

> The City's Municipal Code includes the following:

> Within ninety (90) days after the completion of drilling operations or the abandonment of further drilling, the derrick and all drilling equipment, including temporary tanks, shall be removed from any controlled drill site.

> Well abandonment shall be in accordance with the requirements of the division of oil and gas of the state. Upon such well abandonment, the permittee shall restore the property as nearly as possible to its original condition and shall remove all concrete foundations, oil soaked soil, and debris, and all holes or depressions shall be filled to the natural surface.

Municipal Code, § 10-5-318 (A) 40 & 41 (emphasis added).

California's Public Resources Code contains the principal laws governing the

regulation of oil wells, including wells after they cease to be in use.  DOGGR is the

principal state agency responsible for regulating the drilling, operation, maintenance,

and abandonment of all oil, gas, and geothermal wells in the state. See PRC § 30418.  Any

"operator" of an oil well or production facility is required to comply with DOGGR's regulations applicable to oil wells and production facilities. See PRC § 3270(b). This includes obligations for handling oil and gas wells and extraction facilities that have been or are being idled, deserted or abandoned. DOGGR has the authority to order "the plugging and abandonment of a well that has been deserted." PRC § 3237. It also has the authority to order the proper abandonment of any well determined either to be a hazardous or idle-deserted well. PRC § 3255(a).

> Under California law, a well is properly abandoned when it has been shown
>
> that all proper steps have been taken to isolate all oil-bearing or gas- bearing strata encountered in the well, and to protect underground or surface water suitable for irrigation or farm or domestic purposes from the infiltration or addition of any detrimental substance and to prevent subsequent damage to life, health, property, and other resources. … [P]roper steps include the plugging of the well, decommissioning the attendant production facilities of the well, or both . . . .

PRC § 3208(a). The term "decommission" means "to safely dismantle and remove a production facility and to restore the site where it was located." Cal. Code Regs., tit. 14, § 1760(c). Abandoned wells present a substantial, inherent risk from, among other things, the potential accumulation of methane and other hazardous gases, especially in high-risk urban areas. See PRC § 3240.

The wells at the Site are designated as "critical wells," a pipeline is designated as an "urban pipeline," and the Site is designated as an "environmentally sensitive" and "urban" area; California's regulations recognize that, at such sites, the potential for immediate and serious hazards is greatly heightened. See, e.g., Cal. Code Regs., tit. 14, § 1724.3 (imposing a requirement of special well safety devices for critical wells);

8

§ 1773.4(d) (allowing lower testing standards for tanks that are not in an environmentally sensitive or urban area).

### Venoco's End-of-Lease Operations and Its Chapter 11 Filing

Venoco operated the Site until December 31, 2016, when, as required, Venoco ceased to operate the wells at the Site.  Venoco has not plugged the wells or removed its equipment, tank and derricks.  Venoco filed its chapter 11 petition on April 17, 2017.

Venoco announced its intent to vacate the Site by May 31, 2017, after which Venoco advised that it would "no longer have any employees or contractors in Beverly Hills" to monitor or maintain safety and security on the Site.   Letter, dated April 21, 2017, from Robert G. Burns, Esquire to William Ireland, Esquire (Exhibit A to the Motion).

### State and Local Actions

DOGGR and the City of Beverly Hills have both issued compliance orders directed against Venoco.  Venoco has appealed both orders.

#### *The State's Plug and Abandon Order*

On May 15, 2017, DOGGR issued the *ex parte* Plug and Abandon Order (the "Plug and Abandon Order") (Venoco Exhibit G) directed against Venoco, based on "evidence" of the desertion of the wells at the Site.  DOGGR has ordered and directed Venoco to (a) plug and abandon the wells (and all associated conductors) at the Site; (b) decommission the production facilities; and (c) restore the well site.  DOGGR Order, 2-4 (Plaintiffs' Exhibit 1).  The DOGGR Order further provides that if Venoco fails to act, DOGGR can obtain compliance itself and the costs will constitute a lien against Venoco's real or personal property.  *Id.* at 4.

*The City's Compliance Order*

On May 16, 2017, the City of Beverly Hills issued its Compliance Order to Venoco, (Venoco Exhibit I).  In the Compliance Order, the City of Beverly Hills charges that Venoco "has been in violation of the conditions of its permit and in violation of the Municipal Code since April 1, 2017."  The "violation" resulted from Venoco's failure to perform the actions required of it by March 31, 2017 (i.e., 90 days after the extraction of oil and gas from the premises ceased on December 31, 2016).  The "violation" included the removal of the derrick, drilling equipment, and temporary tanks from the Site; the plugging and abandonment of the wells in accordance with the state law; the removal of all concrete foundations, oil soaked soil, and debris; and the filling of all holes or depressions to the natural surface. Compliance Order at ¶¶ 1.6 to 1.8.

The Compliance Order further provides that "Venoco has threatened to depart from the premises of the Drill Site by May 31, 2017, without any monitoring of the site as well as without having performed the required site remediation. Leaving the site unmonitored would by itself render the Drill Site unsafe and a potential threat to public safety and to the City's environment, due to any loss of integrity in the wells, which have not been properly and safely plugged as is necessary." Compliance Order at ¶ 1.9.

The Compliance Order would impose the following on Venoco:

a.      "[B]egin the process of abandoning the producing wells by first removing all of the pieces of downhole equipment which are inside the wells to allow the production of oil, gas and associated water," by June 9, 2017;

10

b.      "[P]erform the plugging of the producing wells by placing cement inside the well to isolate or plug the underground formation that produces the petroleum, placing other cement plugs to isolate the base of fresh water, and then pouring surface cement plugs," noting that [h]eavy mud may be placed in between the cement plugs or alternately the wells can be filled with cement," by July 7, 2017;

c.      "[R]emove the equipment which was used to process the oil, gas, and water and to assist in its production, including the steel derrick at the site," by July 31, 2017; and thereafter (without specifying dates),

d.      Remove the massive cement structures on the premises, including the well cellar, and remove any soil contamination that might be under the cement;

e.      Cut off below surface grade the wells that were already plugged, with a new surface plug inserted if necessary and a new steel cap placed on the wellhead; and

f.      Regrade the site, to fill in the hole created by the removal of the well cellar.

Compliance Order at ¶¶ 2.1 to 2.4.

At the evidentiary hearing the Court conducted, the Court learned the additional facts which follow.

Mary Jane Wilson ("Ms. Wilson") testified as Plaintiffs' expert witness. Ms. Wilson is an expert in oil and gas exploration and production, in air emissions for oil and gas facilities and contamination issues related to oil and gas facilities. Resume of Mary Jane Wilson, Venoco Exhibit A. Ms. Wilson testified, consistent with her affidavit, that:

1.      Venoco is an operator of the Site (a disputed fact). The abandoned wells present substantial risk (a disputed fact).

2.      Were Venoco to quit the Site and remove its monitoring function, it would create an unsafe situation.  Ms. Wilson testified that the City of Beverly Hills and the School District have a substantial interest in making certain that Venoco continues to monitor the Site.

3.      The City of Beverly Hills and DOGGR have both ordered that monitoring continue and that Venoco decommission the Site.

4.      Venoco's desertion of the Site would violate the Plug and Abandon Order and the Compliance Order.

5.      The impact of well failures is heightened because the Site is located close to the School, the School's recreational facilities, a nearby hospital and homes.

6.      Although not in perfect condition, the Site is in good condition.

Michael Wracher ("Mr. Wracher") next testified for Venoco.  Mr. Wracher is Venoco's Chief Operating Officer with experience as a working geologist.  Mr. Wracher testified that Venoco is providing good and safe monitoring of the wells at the Site.  Mr. Wracher testified that Venoco has reduced its staff at the Site from nine to four employees.  At least one employee is always at the Site.  The employees periodically monitor and record the pressure on the oil wells.  The rated capacity on the wells ranges from 1,500 psi (pounds per square inch) to 5,000 psi.  Two wells are at 700 psi, the others are less.

Finally, Venoco secured the testimony of Wayman Travis Gore, Sr., ("Mr. Gore") as an expert witness.  Venoco Exhibits X and Y.  Mr. Gore is a consulting petroleum engineer.  He has experience with plugging and abandonment issues as well as "shut-in" wells.  In Mr. Gore's opinion, the Site is in very good condition and there is no imminent

and/or identifiable harm at the Site and no minimal or identifiable threat at the Site.  Mr. Gore further testified that the oil wells do not flow on their own, i.e., there will not be a situation in which oil rises in the pipes or the annulus.

Ms. Wilson testified briefly in rebuttal to Mr. Gore's testimony.  She testified that in about 2006, there was an incident in which a well "spurted."  Oil rose in the pipes on one of the wells and overflowed.  She thus testified that Mr. Gore is wrong that the oil will not rise in the pipes by itself.

As of the Petition Date, Venoco no longer held any possessory interest in the Site. The Lease was terminated before the Petition Date and neither the Site nor any fixtures at the Site are property of the Venoco bankruptcy estate.

Similarly, Venoco is a former operator.  The term "operator" is defined as "a person who by virtue of ownership, or under the authority of a lease or any other agreement, has the right to drill, operate, maintain, or control a well or production facility."  Cal. Pub. Res. Code § 3009.  Venoco has no right to drill, operate, maintain or control any of the wells at the Site.

The Lease and the Municipal Code require the wells at the Site to be decommissioned within 90 days.  Yet, Venoco's consultant estimates that it takes between three and eleven years to decommission a site, and Plaintiffs' expert, Ms. Wilson, estimates 270 days.  Both estimates are beyond the 90 days that the Compliance Order allows.  Decommissioning may or may not require the involvement of an environmental study.  If CEQA (California Environmental Quality Act) is involved (a disputed point), it is a process which could take 115 to 450 days to finalize.  Mr. Gore and Ms. Wilson

disagree on the applicability of CEQA to plugging and abandoning, and decommissioning the Site.

## DISCUSSION

### Standard for Preliminary Injunctive Relief

Preliminary injunctive relief is considered extraordinary. *See*, *e.g.*, *Kos Pharms, Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir. 2007) (*citing American Tel. & Tel. Co. v. Winback & Conserve Program, Inc.*, 42 F.3d 1421, 1427 (3d Cir. 1994) ("Preliminary injunctive relief is 'an extraordinary remedy' and 'should be granted only in limited circumstances.'"); *IDT Telecom, Inc. v. CVT Prepaid Solutions, Inc.*, 250 F.App'x 476, 478 (3d Cir. 2007) (same).

Courts consider the following factors in determining whether to issue a preliminary injunction: "(1) the likelihood that the moving party will succeed on the merits; (2) the extent to which the moving party will suffer irreparable harm without injunctive relief; (3) the extent to which the nonmoving party will suffer irreparable harm if the injunction is issued; and (4) the public interest." *Liberty Lincoln-Mercury, Inc. v. Ford Motor Co.*, 562 F.3d 553, 556 (3d Cir. 2009). The failure to meet any one of the factors compels denial of the motion. *See*, *e.g.*, *NutraSweet Co. v. Vit-Mar Enter., Inc.*, 176 F.3d 151, 153 (3d Cir. 1999) ("A plaintiff's failure to establish any element in its favor renders a preliminary injunction inappropriate."). The Plaintiffs fail to satisfy all four of the elements.

### Likelihood of Success on the Merits

In establishing a likelihood of success on the merits, the burden is on the party seeking injunctive relief to show a reasonable probability that it will prevail on the merits.

14

*Oburn v. Shapp*, 521 F.2d 142, 148 (3d Cir. 1975); *see also Sabaratek Cor. v. Lasalle Bank, N.A.* (*In re Sabaratek Corp.*), 257 B.R. 732, 735 (Bankr. D. Del. 2009) ("To succeed in obtaining a preliminary injunction, the [movants] must establish that they are likely to convince the Court to issue a permanent injunction.").   Plaintiffs cite cases involving the release (or threatened release) of hazardous waste.   *See, e.g., United States v. Nicolet, Inc.*, 857 F.2d 202 (3d Cir. 1988) (involving cleanup costs for debtor's hazardous waste site); *United States v. Apex Oil Company, Inc.*, 579 F.3d 734 (7th Cir. 2009) (RCRA action to clean up contaminated site); *In re Wall Tube & Metal Prods. Co.*, 831 F.2d 118 (6th Cir. 1987) (action for response costs incurred at hazardous waste site); *In re Torwico Elecs., Inc.*, 8 F.3d 146 (3d Cir. 1993) (seeking to impose cleanup of hazardous wastes). That is not the case before the Court.   Venoco is making certain that the surrounding community is protected from harm which the Site might pose. Venoco has not put public health at risk or refused to respond or reimburse for response costs. Venoco has also made it clear that it intends to remain at the Site until a replacement entity is installed.

The important decision of the Supreme Court in *Midatlantic Nat'l Bank v. New Jersey Dep't of Envt'l Prot.*, 474 U.S. 494 (1986) is instructive.   In *Midatlantic*, the Supreme Court held that a bankrupt company may not abandon property in the face of a state statute or regulation that is reasonably designed to protect the public.   Instead, the bankrupt must develop conditions that will adequately protect the public's health and safety.   The trustee abandoned waste facilities, removed a 24 hour guard service and shut down the fire-suppression system.   The state (New York) had to decontaminate the facilities at a cost of $2.5 million.   The Supreme Court discussed that "[n]either the Court nor Congress

has granted a trustee in bankruptcy powers that would lend support to a right to abandon property in contravention of state or local laws designed to protect public health or safety." *Id.* at 502.  Thus, the Supreme Court held that "a trustee may not abandon property in contravention of a state statute or regulation that is reasonably designed to protect the public health or safety from identified hazards." *Id.* at 506.  Therefore, the Supreme Court ruled that the section of the Bankruptcy Code that deals with abandonment, Section 554, does not preempt such local and state statutes which protect the public health.

*Midatlantic* is very much distinguishable from the present case.  The Court is mindful that *Midatlantic* is subject to narrow interpretation.  The Supreme Court referred to its ruling as follows:

> This exception to the abandonment power vested in the trustee by § 554 is a narrow one.  It does not encompass a speculative or indeterminate future violation of such laws that may stem from abandonment.  The abandonment power is not to be fettered by laws or regulations not reasonably calculated to protect the public health or safety from imminent and identifiable harm.

*Id.* at 506-07 n. 9.  In *Midatlantic* there was "imminent and identifiable" harm.  The toxic material already existed.  Here, the Site is in good order.  There is no "imminent and identifiable" harm present.  Also, in *Midatlantic* the trustee was seeking to abandon the facilities.  Venoco, on the other hand, no longer possesses or operates the Site.  Venoco remains at the Site only in a monitoring role.  The Court therefore concludes that the narrow exception described in *Midatlantic* is inappropriate.

Cases which have interpreted *Midlantic* focus largely on "imminent and identifiable" harm. For example, *In re Howard,* 533 B.R. 532, 548 (Bankr. S.D. Miss. 2015), involved garbage, tar, pits of unidentified waste, naturally radioactive material, surface and soil contamination on the property.   The court declined to find an imminent harm to public safety because the assessments did not reveal "any information regarding how the presence of the materials can or will affect the public health or safety." In *In re Unidigital Inc.*, 262 B.R. 283, 288 (Bankr. D. Del. 2001), the court ruled that the possible presence of chemicals in a 30,000-pound printer the debtor sought to abandon was insufficient to show an imminent harm to public health.  The court in *In re Mahoney-Troast Construction Co.*, 189 B.R. 57, 61 (Bankr. D. N.J. 1995) found that the movement of more than 200 tons of gasoline-contaminated soil was not an imminent threat to the public. Gasoline seeping from tanks on the property was not in danger of migrating onto adjacent property or into water.  These cases illustrate that courts are loathe to find that a debtor who is present at a location poses an "imminent and identifiable harm."  Again, Venoco is present at the Site only in a monitoring role.

Plaintiffs rely on *Torwico Electronics, Inc. v. State of New Jersey, Dep't of Env'l Protection* (*In re Torwico Electronics, Inc.*), 8 F. 3d 146 (3d. Cir. 1993).  There, the debtor sought to bar the state's claim that was filed after the bar date.  The Third Circuit disagreed, finding that Torwico's obligations under a ruling by the New Jersey Environmental agency that Torwico file a closure plan was not a claim.  The holding applied even though Torwico no longer possessed the property where the pollution occurred.  The reason for the Third Circuit's ruling was that "Torwico's wastes . . .  are

presenting a continuing environmental hazard." *Id.* at 150.  To repeat, Venoco is not polluting and has not polluted.  The Site is in good condition.

Unlike *Torwico*, the holding in *In re Mahoney-Troast Construction Co.*, 189 B.R. 57, 61 (Bankr. D.N.J. 1995) is illustrative of the situation here.  In *Mahoney-Troast*, the court focused on the facts that the company had polluted and the pollution remained present. Neither are true in Venoco's case.

Venoco is willing to remain on the Site and to monitor for a short while longer. Under such circumstances, the Site will not be an immediate threat to the public.

As for the decommissioning, those costs are best dealt with as a bankruptcy provides, as a claim.  Plaintiffs can file a claim in the bankruptcy and the Court can then decide the proper classification and amount of the claim.  In *Torwico*, the Third Circuit analyzed *In re Chateaugay*, 944 F. 2d 997 (2d Cir. 1991) and *In re CMC Heartland Partners*, 966 F. 2d 1143 (7th Cir. 1992) which both discussed the filing of claims for the cost of cleanup as an appropriate remedy.

The Plaintiffs also argue that Venoco must remove the "fixtures" at the Site, the derrick, tanks and buildings.  The fixtures are not property of Venoco's estate.  Venoco does not own them.  Further, the fixtures surely do not present any threat of immediate harm to the public.  Venoco flushed the oil tanks and there are no hazardous materials in the other fixtures.

The expectations of the Plaintiffs on decommissioning are not suitable in a bankruptcy case, and the Court follows *In re Unidigital*, 262 B.R. 283 (Bankr. D. Del. 2001). As the Court referred to above, in *Unidigital*, the debtors sought to abandon a very large

30,000 pound industrial printer. The removal of the printer from the building in which it was located first required extensive dismantling and then a crane to remove the property from the building which debtor leased. The landlord also made the unsubstantiated claim that there were hazardous chemicals in the printer. The court held that the debtor could abandon the printer because abandonment could be disallowed "only where there is an imminent and identifiable harm to the public health or safety," and only where the debtor is "attempting to abandon property in contravention of state or local laws or regulations designed to protect the public." *Id.* at 286-87. The court found no proof of hazardous materials and permitted the abandonment.[4]

The ultimate answer to the Motion is this: there is no immediate and irreparable harm as long as the Site is monitored. Venoco is in bankruptcy liquidation and cannot be expected to remain in place for long. Therefore, Plaintiffs must hire a replacement monitoring firm. Likewise, Plaintiffs must find a firm to decommission the Site. Their losses are compensable through the filing of claims.

Irreparable Harm

The Plaintiffs must show they will be irreparably harmed by Venoco's action to obtain a preliminary injunction. Pure economic injury which is compensable in money damages is not irreparable injury. *Grant Heilman Photography, Inc. v. John Wiley & Sons, Inc.*, 864 F. Supp. 2d 316, 325 (E.D. Pa. 2012). The injury or harm must be irreparable and unique in nature. *Id.*

---

[4]    The court further ruled that the landlord was not entitled to an administrative claim but the Court is not addressing the nature of the claims, only that one may exist.

Venoco argues and the Court agrees that oversight and monitoring can be transitioned, which will leave the Plaintiffs unexposed to harm.  The costs can be compensated through money damages, as the Court will next discuss.

Plaintiffs ask for a reserve to enable Venoco to comply with the Plug and Abandon Order and the Compliance Order.  A reserve would not maintain the status quo.  Where a movant seeks a preliminary junction that will alter the status quo they will bear a particularly heavy burden in demonstrating its necessity. *See Acierno v. New Castle County*, 40 F.3d 645, 653 (3d Cir. 1994).

More importantly, the Plaintiffs' request for the reserve is an admission that money damages would be sufficient which defeats the Plaintiffs' claims of irreparable harm. If money will suffice there is no irreparable harm.  *See*, *e.g.*, *Tillery v. Leonard & Sciolla, LLP*, 437 F.Supp.2d 312, 329 (E.D. Pa. 2006) (*citing FMC Corp. v. Control Solutions, Inc.*), 369 F.Supp.2d 539, 573 (E.D. Pa. 2005) ("An irreparable injury is one that 'is not remote or speculative, but actual and imminent and for which monetary damages cannot adequately compensate.'").  The Plaintiffs will hire a third-party contractor to monitor and will then have the right to assert a claim for damages.  Venoco will no longer exist to perform the decommissioning process, and the Plaintiffs will pay to decommission the Site and submit a claim for the costs.

Accordingly, if Venoco's termination of services and failure to perform decommissioning is a breach of contract or otherwise damages the Plaintiffs, then the Plaintiffs' entitlement to money damages eliminates the need for a preliminary injunction. *See*, *e.g.*, *Frank's GMC Truck Center, Inc. v. General Motors Corp.*, 847 F.2d 100,

102-03 (where plaintiff fails to prove harm which cannot otherwise be compensated by money damages, it has failed to sustain its substantial burden of showing irreparable harm); *see also ECRI v. McGraw- Hill, Inc.*, 809 F.2d 223 (3d Cir. 1987) (*citing Glasco v. Hills*, 558 F.2d 179, 181 (3d Cir. 1977)) ("The 'requisite feared injury or harm must be irreparable—not merely serious or substantial,' and it 'must be of a peculiar nature, so that compensation in money cannot atone for it.'").

The Plaintiffs cannot meet the burden of showing they would suffer irreparable harm if Venoco no longer provides the monitoring services or is unable to fund the cost of the decommissioning. They will have the right to bring claims against the estate for the funds they use to monitor and to decommission the Site.

Harm to Venoco

Venoco and its estate will suffer substantial irreparable harm if the Court grants injunctive relief. Courts must balance the harm to the nonmoving party against the potential harm to the moving party. *Grant Heilman Photography, Inc.*, 864 F.Supp.2d at 327. Venoco cannot be held in suspension. It must be allowed to liquidate its estate.

Public Interest

A factor courts consider in assessing whether to grant a preliminary injunction is the public interest. *Liberty Lincoln-Mercury, Inc.*, 562 F.3d at 556. If the transition of the monitoring process from Venoco is maintained, there will be no threat to the public's health or safety. Injunctive relief will not serve the public interest.

## CONCLUSION

The Court has found that (1) it is unlikely that the Plaintiffs will succeed on the merits, (2) the Plaintiffs will not suffer irreparable harm, (3) Venoco will suffer irreparable harm were the Court to grant the injunction and (4) the public interest is satisfied. Accordingly, the Court will deny the requested preliminary injunction. However, the transition to a new monitor is of critical importance and the presence of Venoco employees at the Site will aid in the transition.  Therefore, the Court's order denying injunctive relief will require Venoco, at its cost, to remain at the Site to monitor and assist in the transition through June 30, 2017.

The Court will issue an Order consistent with this ruling.

Dated:  May 31, 2017

KEVIN GROSS, U.S.B.J.